STATE OF CONNECTICUT *v.* ROBERT LEE MITCHELL

HOUSE, C. J., LOISELLE, MACDONALD, BOGDANSKI and LONGO, Js.

Argued January 15—decision released March 25—reargued
June 5—substitute decision released July 15, 1975

*John M. Byrne,* assistant public defender, with whom, on the brief, was *James D. Cosgrove,* chief public defender, for the appellant (defendant).

*Richard E. Maloney,* assistant state's attorney, and, on reargument, *John D. LaBelle,* state's attorney, with whom was *Richard F. Banbury,* assistant state's attorney, for the appellee (state).

MacDonald, J. The defendant was tried upon a two-count information charging him with the offenses of robbery in the second degree in violation of General Statutes[1] § 53a-135 (a) (2) and larceny in the third degree in violation of General Statutes § 53a-124 (a) (4). The jury returned a verdict of guilty on both counts. The court denied the defendant's motion to set aside the verdict and rendered judgment on July 27, 1973, from which the defendant appeals.

The defendant assigns error in two evidentiary rulings of the trial court, each essentially dealing with the testimony of Mrs. Gloria Spagna, an eyewitness to the crime, called by the state to testify. The finding, as it relates to the testimony of Mrs. Spagna, may be summarized as follows: She was called as a witness by the state without having been

---

[1] In the printed record, both the substituted information and the judgment refer to robbery in the second degree as in violation of "Section 53a-13 (a) (2)" of the General Statutes instead of the correct reference to § 53a-135 (a) (2). A comparison with the court file discloses that both original documents contained the correct reference and that the "53a-13 (a) (2)" in the printed record was merely a typographical error in omitting the "5" after "13." This error was not noted or mentioned in the briefs or oral argument and the court will make no issue of the error other than to mention it.

previously interviewed by any member of the state's attorney's office. She testified that she had arrived at the Towne House Motel, the scene of the robbery, at 12:15 a.m. to 12:45 a.m., to visit a guest of the motel. Mrs. Spagna described the man who robbed the cash register as light-complexioned with "a very well cut Afro, not a bushy Afro," but without a mustache, twenty-five to thirty years old, not too tall, stocky, wearing a tan raincoat or camel's hair coat. On December 17, 1972, Mrs. Spagna had given an oral statement to the Wethersfield police department which was summarized by the department and placed in their report. The state claimed that the description in the report was inconsistent with Mrs. Spagna's testimony describing the man who had robbed the cash register, on this basis claiming surprise and the right to impeach and cross-examine Mrs. Spagna. The court directed the state's attorney to use the statement in the report to refresh the recollection of the witness. After reviewing this report, Mrs. Spagna admitted that she had originally described one of the holdup men as having a medium complexion, "natural hairdo not teased into an Afro," and wearing a mustache. Mrs. Spagna, after refreshing her recollection again, testified that she had told the police that the man previously described was five feet five to five feet seven inches in height. She also said that she did not recognize anyone in the courtroom as either robber. On cross-examination Mrs. Spagna testified that the defendant was not one of the men who committed the robbery; and, further, that she had been questioned by the Wethersfield police several times because her description was different from that given by Mrs. Louise Slater, the attendant at the motel. Detective John S. Karangekis of the Weth-

ersfield police had advised her that he believed she was lying, and because of this fact, he arranged two polygraph examinations which she took.

Detective Karangekis testified on redirect examination that there were several inconsistencies in the statement given by Mrs. Spagna and that this was the reason the polygraph examinations were arranged. When he spoke to Mrs. Spagna on December 17, 1972, she gave a description of the holdup men and said she was at the motel that night to visit Louise Slater. The description she gave in the police interview was inconsistent with the description she gave during the trial. When Detective Karangekis interviewed Mrs. Slater at a later time she stated that she did not know Mrs. Spagna and that Mrs. Spagna had come to the motel that night looking for "someone allegedly named Steve." The defendant took timely exception to the court's rulings allowing testimony to be produced by the state designed to impeach the credibility of Mrs. Spagna.

In a recent case this court reaffirmed the long-standing rule with regard to impeaching one's own witness: "It has long been the accepted general rule that a party presenting a witness may not directly discredit him or impeach his credibility. *Carney* v. *Hennessey,* 77 Conn. 577, 586, 60 A. 129; *Carpenter's Appeal,* 74 Conn. 431, 435, 51 A. 126. 'However strong may be the belief of counsel that his witness is biased, prejudiced or hostile, it is a fundamental requirement of a just and orderly procedure that having called a witness and sought the benefit of his testimony by putting him on the witness stand, . . . he cannot directly impeach him save where it is shown to the satisfaction of the court that the testi-

mony of the witness is a surprise to him, or is inconsistent with other statements made by the witness, that he is adverse or hostile or for some equally potent reason, as the interests of justice under the particular circumstances of the case seem to the court to require.' *Schmeltz* v. *Tracy,* 119 Conn. 492, 498, 177 A. 520. A party who is surprised by the adverse testimony of his own witness, although voluntarily called, may be permitted to examine him for the purpose of showing that he has made statements contradictory to his testimony upon the stand. Such examination is, however, a privilege and not a matter of right. *Gondek* v. *Pliska,* 135 Conn. 610, 616–17, 67 A.2d 552; *Sandora* v. *Times Co.,* 113 Conn. 574, 585, 155 A. 819; *State* v. *Gargano,* 99 Conn. 103, 113, 121 A. 657." *State* v. *Jones,* 166 Conn. 620, 622, 353 A.2d 764.

The state claimed surprise in the testimony of Mrs. Spagna that she was unable to identify the defendant as a perpetrator of the robbery. In fact, the finding indicates that at the insistence of Detective Karangekis prior to trial, Mrs. Spagna was subjected to two polygraph examinations as a result of her indication that she could not identify the defendant. The state was aware, in advance of trial, that this would be her testimony. The element of surprise is clearly lacking in this instance and that element must be demonstrated prior to any attempt to impeach one's own witness' testimony. That the witness did not testify as the state had hoped she would is certainly insufficient grounds to declare her adverse and to allow her to be cross-examined and impeached by the proponent of her testimony.

It is well established, as claimed by the state, that a state's attorney has a duty, not solely to

obtain convictions, but "to ensure that all evidence tending to aid in the ascertaining of the truth be laid before the court, whether it be consistent with the contention of the prosecution that the accused is guilty." *State* v. *Moynahan,* 164 Conn. 560, 568, 325 A.2d 199; *State* v. *Harris,* 147 Conn. 589, 598, 164 A.2d 399; *State* v. *Zimnaruk,* 128 Conn. 124, 127, 20 A.2d 613.

It would not appear that in the circumstances of this case the performance of this duty imposed upon the state's attorney any obligation to go further than to make known to the court and to the defendant that such evidence exists in the same manner as any other evidence that tends to be exculpatory is revealed. Here, for example, knowing in advance that Mrs. Spagna had refused to identify the defendant as one of the robbers, the state could have informed the court and the defendant that Mrs. Spagna had witnessed the robbery, but that it did not propose to call her as a witness. If, for tactical reasons, he preferred to introduce her as a state's witness, the state's attorney could have simply inquired if she had witnessed the event, leaving it to the defendant to cross-examine or to call her as a defense witness. Instead, the state's attorney inquired at length about other details of the robbery and not once inquired whether the defendant was one of the robbers, waiting until the very end of his direct examination before inquiring: "All right, and do you recognize either of these two men in the courthouse?"—to which Mrs. Spagna replied: "No, I don't." At this point, the state's attorney claimed surprise and sought to attack her credibility in an apparent effort to destroy in advance the effectiveness of any favorable testimony she might give for the defendant.

A state's attorney has no more of a duty to vouch for a witness whom he would prefer simply to make known to the court and not to examine as a state's witness than he has to introduce in behalf of the state and vouch for any alibi witness whose name is submitted to him in the defendant's notice of alibi defense in accordance with Practice Book § 533G. The state's attorney went far beyond his obligation to disclose in pursuing extensively his direct examination of Mrs. Spagna and it was a violation of our well-established rule to permit him to impeach one whom he had made his own witness in the absence of surprise or hostility, neither of which was shown to exist here. The court erred in admitting testimony offered to impeach Mrs. Spagna's credibility.

Although our ruling on the first claim of error is dispositive of our decision to order a new trial, two additional claims are so closely related to that ruling as to warrant discussion.

After the state rested, and in the absence of the jury, the defendant called Trooper John H. Dewey and Sergeant Timothy G. Kelly, polygraph examiners for the Connecticut state police. The defendant sought to lay a foundation for the admission of testimony as to the results of the polygraph examinations and for the admission of Sergeant Kelly's opinion with regard to the truthfulness of Mrs. Spagna's answers given in reply to questions asked of her during the examination.[2] The court refused

---

[2] The following questions were asked of Mrs. Spagna by Sergeant Kelly during the polygraph examinations: "(a) Did you plan with anyone to rob the motel? (b) Do you know the names of the two blacks that held up the motel? (c) Have you talked to the two blacks since the robbery? (d) Did you receive any of the money from the robbery?"

to permit this evidence to be submitted to the jury. The defendant duly excepted to this ruling and assigns it as error.

In claiming error in the court's refusal to admit testimony concerning polygraph tests given to Mrs. Spagna by police officers, the defendant, in his brief, asserts that he sought admission of this testimony as showing prior consistent statements by Mrs. Spagna. Although the record indicates that during the trial he claimed such testimony solely for the purpose of proving the truth of the responses Mrs. Spagna gave to the questions propounded to her as indicated by the polygraph machine, we will consider the ruling on the basis of both claims.

With respect to the claim that such testimony would show prior consistent statements, we recognized in *Thomas* v. *Ganezer,* 137 Conn. 415, 78 A.2d 539, that prior consistent statements may be admitted in certain limited situations and that the determination of this issue is left to the discretion of the trial court. An important qualification was appended to this rule (p. 421): "When a prior consistent statement is received . . . under the principle we have applied, it is admitted to affect credibility only, not to establish the truth of the statement." To admit the polygraph results and the examiner's opinion of them as to the truthfulness of the subject's answers as proof of a prior consistent statement would directly contravene the rule as to the limited use of prior consistent statements. If, however, the defendant sought to produce testimony from the polygraph examiner that the subject had given a statement at the time of the examination, independently or in response to ques-

tions, that is consistent with the testimony given at trial, the fact that such statements were made and the substance of those statements would be admissible under the rationale of *Thomas*. The results of the polygraph tests or the opinion of the examiner, however, would be inadmissible, since neither has bearing on the limited use of the prior consistent statement. Prior consistent statements are not offered to prove the truth of the substance contained therein and thus there is no need to admit evidence that the declarant was truthful or was deceitful. All that is allowed under the rule is the demonstration that the statement was made and is consistent with the challenged trial testimony.

With respect to the claim that such testimony would show the truth of Mrs. Spagna's answers, this court previously has expressed its opinion of the reliability of polygraph examinations. "The unreliability of the polygraph test has resulted in its universal rejection as competent legal evidence of truthfulness." *Molino* v. *Board of Public Safety*, 154 Conn. 368, 376, 225 A.2d 805. This view was reiterated in *State* v. *Carnegie*, 158 Conn. 264, 272, 259 A.2d 628, cert. denied, 396 U.S. 992, 90 S. Ct. 488, 24 L. Ed. 2d 455. The majority view is in alignment with our position in *Molino* and *Carnegie*. See note, 23 A.L.R.2d 1306, as supplemented by the Later Case Service. The record before us fails to demonstrate any basis for a reevaluation of our attitude towards the competence of such evidence. Although there has been a growing trend among law enforcement personnel toward the use of the polygraph as an investigative aid, its reliability is still subject to question. It is a subjective rather than objective examination, the results of which are

influenced by a number of human variables and we, therefore, adhere to our position as expressed in *Molino* and *Carnegie*.

Credibility as an issue is committed to the sole determination of the trier of fact; *State* v. *Farrah,* 161 Conn. 43, 49, 282 A.2d 879; *Rood* v. *Russo,* 161 Conn. 1, 3, 283 A.2d 220; *Enlunde* v. *Buske,* 160 Conn. 327, 330, 278 A.2d 815; and the admission of the results of polygraph examinations, rather than serving as an aid to that determination, would tend to cloud the issue with an aura of scientific conclusiveness of the examiner's opinion that could foreclose a true consideration of the issue. We are not convinced that the polygraph has progressed to a level of sophistication that would warrant the conclusiveness that would, in all probability, be appended to its results.[3] The court did not err in refusing to admit evidence concerning the polygraph tests given to Mrs. Spagna.

The defendant further argues on the authority of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215, that the testimony of Sergeant Kelly concerning the results of the polygraph tests is classifiable as exculpatory and should have been admitted. The rationale of *Brady* is that the prosecution has a duty to disclose exculpatory information, and no claim is made that the state's attorney

---

[3] A further problem area arises in the admission of such evidence with regard to the weight and interpretation that is to be accorded to a common result of polygraph examinations—inconclusiveness; that is, that the examiner is unable to reach a conclusion as to whether the subject is truthful in his or her replies. The jury could be led far afield on a matter of peripheral relevance, and the battle of opinion that might ensue as to the effect to be accorded this finding, or more properly stated, lack of finding, by the examiner would cast a tenebrific pall upon the central issues in the case.

in this case failed to cooperate fully in disclosing to the defendant complete information concerning the polygraph tests and their results. *Brady* imposes no rule upon the courts to admit all exculpatory information without regard to its competence and there is no merit to this claim.

There is error solely with respect to the admission of testimony offered by the state to impeach its own witness, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.